1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3     ----------------------------------------------------------

4     JIMMY G. BILES, JR.,            Case No. 11-CV-00294-J

5          Plaintiff,                 Cheyenne, Wyoming
                                      January 4, 2012
6          vs.                        8:33 a.m.

7     LISA SHAURETTE FALLON,

8          Defendant.

9     JOHN H. SCHNEIDER and
      MICHELLE SCHNEIDER,
10
           Non-Party Movants.        **CERTIFIED COPY**
11
      ----------------------------------------------------------
12

13                TRANSCRIPT OF MOTION PROCEEDINGS
14
               BEFORE THE HONORABLE ALAN B. JOHNSON
15                UNITED STATES DISTRICT JUDGE

16
      APPEARANCES:
17
      For the Plaintiff:    MR. R. DANIEL FLECK
18                          MS. MARY KRISTEEN HAND
                            Attorneys at Law
19                          THE SPENCE LAW FIRM, LLC
                            P.O. Box 548
20                          Jackson, WY 83001

21    For the Defendants:   MR. P. CRAIG SILVA
                            Attorney at Law
22                          WILLIAMS PORTER DAY & NEVILLE, P.C.
                            159 N. Wolcott, Suite 400
23                          P.O. Box 10700
                            Casper, WY 82602
24

25            OFFICIAL COURT REPORTER - (307)778-0078

      Proceedings recorded by mechanical stenography,
      transcript produced by computer.

11-CV-00294-J                    Motion              01/04/2012    2

 1   APPEARANCES:  (Cont.)

 2   For the Movant:          MR. LAURENCE W. STINSON
                              Attorney at Law
 3                            BONNER STINSON, P.C.
                              1421 Rumsey Avenue
 4                            Cody, WY 82414

 5   Court Reporter:          MS. JULIE H. THOMAS, RMR, CRR
                              2120 Capitol Avenue, Room 2228
 6                            Cheyenne, WY 82001
                              (307)778-0078   CA CSR No. 9162
 7

 8                   *     *     *     *     *

 9                          I N D E X

10

11   ORAL ARGUMENT                                      PAGE

12   MOTION TO QUASH
         Mr. Stinson                                      3
13       Mr. Fleck                                        8
         Mr. Stinson                                     18
14       Mr. Fleck                                       20
         Mr. Silva                                       21
15       Mr. Fleck                                       22
         Mr. Stinson                                     24
16       Mr. Fleck                                       24
         Ruling of the Court                            25
17

18

19

20

21

22

23

24

25

1        (Proceedings commenced 8:33 a.m.,

2        January 4, 2012.)

3            THE COURT:  The matter for hearing this morning is

4    Jimmy Biles against Lisa Fallon, Docket 11-CV-294.  Dr. Biles

5    practices medicine in the Cody area, and this matter concerns

6    an issue that exists by and between the third party and

7    presently a nonparty to this suit but defendants in another

8    brought by Dr. Biles, John and Michelle Schneider.  The third

9    parties have moved to quash a subpoena that is aimed I think

10   at attempting to discover the nature of conspiratorial action

11   between Fallon and Schneider to injure Dr. Biles.

12           Appearing by telephone conference call this morning

13   we have for Dr. Biles Kristeen Hand, Daniel Fleck.  Appearing

14   for the Schneiders is Laurence Stinson.  And appearing for the

15   Defendant Fallon is Peter Craig Silva.

16           Are the parties ready to proceed?

17           MR. FLECK:  Yes, Your Honor.

18           MR. STINSON:  The Schneiders are, Your Honor.

19           MR. SILVA:  Yes, sir, Your Honor.

20           THE COURT:  Very well.  I will hear arguments at this

21   point.  And identify yourselves for the record so the court

22   reporter can attribute your arguments to you.

23           MR. STINSON:  Your Honor, this is Laurence Stinson

24   representing nonparties Michelle and John Schneider.  I take

25   it I'll go first since its my motion, Your Honor.  I know the

 1   conference is set for a short time this morning, so I'll get

 2   to my point.

 3          It seems to me there are two questions we are asking

 4   the Court to address.  The first is whether the subpoena

 5   creates an undue burden or expense, and in line with that the

 6   second is whether the plaintiff in response to our motion to

 7   quash has shown relevance or need or -- and a balancing of the

 8   six other factors from the Wiwa v Royal Dutch Pet case.

 9          Getting right to the heart of the matter, Your Honor,

10   the defendant, Lisa Fallon, has been deposed in this case.  I

11   have not viewed her deposition.  The representation has been

12   made to me that the parties have agreed for the deposition to

13   be sealed, but I am unaware of any court order sealing it.

14   Certainly the Court is able to access any sealed document, and

15   the Court has access to any testimony whether the Schneiders

16   as nonparties do or do not.

17          Mr. Silva was asked by the plaintiff's firm it's my

18   understanding to contact the Schneiders' lawyer, that's me,

19   and to discuss the facts in this case.  He did so, and in that

20   discussion I was advised that during the deposition Ms. Fallon

21   testified that she and she alone is the architect of the

22   alleged defamatory flyer that is the heart and the exclusive

23   issue in the Biles v Fallon case.  I make that representation

24   to the Court as to what I was told.  I haven't seen the

25   deposition.  But the plaintiff's objection to the motion to

1   quash does not deny the assertion made in the motion to quash

2   that Lisa Fallon took sole responsibility for creating the

3   flyer, did not seek preapproval of the information in that

4   flyer from the Schneiders, and did not have that flyer

5   ratified or otherwise approved of by the Schneiders.  So in

6   light of that, Your Honor, we think Rule 45(c)(1) states that

7   an attorney must take reasonable steps to avoid imposing undue

8   burden or expense, that's the language, must, and it further

9   states the Court must enforce this duty.

10          If, as it has been represented, Ms. Fallon does take

11   sole and exclusive responsibility for the flyer after seven

12   hours or so of deposition, then the burden -- there's been no

13   relevant or reasonable link between the information sought and

14   plaintiff's need.

15          More importantly, there's been no explanation on the

16   record with citation to any authority of the allegations made

17   by the plaintiffs in their responsive pleading.  There's a

18   sort of list on page 8 and 9 of the plaintiff's responsive

19   pleading that makes a series of broad allegations.  I look at

20   those in two lights, Your Honor.

21          The first is that even if some of those are true,

22   they are not contained within the flyer.  For example, a

23   statement is made by the plaintiff that Dr. Schneider tells

24   Ms. Fallon that Dr. Biles has been -- has driven his car off

25   the road while drinking.  The plaintiff states this is false.

1    Well, whether that's true or false is irrelevant.  It's not

2    contained within the flyer.  And there are several allegations

3    there that are not contained within the flyer.  So the

4    question is whether there's a link between the information in

5    the flyer and some conduct on the part of the Schneiders.

6    There's been no assertion of that, and there's been no support

7    to the -- there's been assertion, but there's been no support

8    to the record or any evidence, and I would think that that's

9    paramount and key to the Court's understanding.

10          With regard to the subpoena, Your Honor, we believe

11   it's overbroad because it seeks two years of information:

12   Specifically, any phone calls to any Indiana area code is the

13   way I read it; production, production of all computers or

14   phones in control of the Schneiders for a two-year period; a

15   detailed list of bank accounts with a transaction history for

16   15 years; years of e-mail and other communication between the

17   Fallons and the Schneiders.

18          Now, there's no denying on the part of the Schneiders

19   or I don't believe anybody else, I'm assuming Miss Fallon has

20   admitted this, but the Fallons and the Schneiders know each

21   other.  They have been friends.  I believe the Schneiders are

22   godparents of Ms. Fallon's child.  And there's going to be

23   communication between them, or I assume there is.  I don't

24   think anyone is denying that.  But it would seem key for the

25   Court to review her testimony in toto to understand if what I

1  have been told is correct and, in fact, if she does admit to

2  being the sole and principal -- or the sole, excuse me,

3  architect of that flyer.  If so, the relevance or need for the

4  information sought is simply nonexistent.

5          Another point made by plaintiffs in their response,

6  Your Honor, was that Mr. -- excuse me, Dr. Schneider and

7  Ms. Schneider did not deny the broad sort of sweeping

8  allegation that they are somehow involved in the creation of

9  the flyer.  It's my understanding, and I have represented this

10  to the plaintiff's counsel, that, in fact, their testimony

11  would be they were not the architects of that flyer, they did

12  not create the flyer, they did not preapprove the flyer, and

13  they were not aware of the mailing of the flyer before they

14  received the flyer in the mail.  So that testimony may come to

15  light if the case against Dr. Schneider and Ms. Schneider is

16  served, which it hasn't been yet, and if their testimony is

17  taken.  But it seems presumptuous in the context of this case

18  to make that statement that the denial does not exist and,

19  therefore, the Court should understand that there's some sort

20  of tacit admission on the part of Dr. Schneider.  So I wanted

21  the Court to understand that that's not the case.

22          Lastly, Your Honor, on page 9 of plaintiff's response

23  there's a statement, a single sentence that says Defendant

24  Fallon did not act alone, but there's no citation for that.

25  There's no reference to a deposition.  There's no reference to

1    some other documentation that would contradict the

2    representation I've been told which is she says she did.

3    Without belaboring the point, it simply seems a very easy

4    process for her deposition testimony to be produced to the

5    Court at the very least so the Court can take in camera review

6    of that deposition and find if there is good and valid grounds

7    to allow this broad subpoena and to allow the discovery of

8    these items.  There is -- the Schneiders are not getting rid

9    of any information they have.  They have been instructed and

10   have agreed to hold on to any information they have pending

11   this Court's ruling, and there is no worry about waste or

12   spoliation of any evidence that would exist.  But, Your Honor,

13   I think first there has to be some link to those six factors

14   in Wiwa v Royal Dutch Pet that there is relevance or need and

15   that that relevance or need is surpassing and paramount to the

16   broad, broad request and the burden which is objected to.

17        Unless the Court has any questions, I don't have

18   anything further, Your Honor.

19        THE COURT:  Thank you, Mr. Stinson.

20        Who will be speaking next?

21        MR. FLECK:  Your Honor, this is Dan Fleck.

22        THE COURT:  Mr. Fleck.

23        MR. FLECK:  I think that the Court has been educated

24   about, through the brief or through the Complaint, about what

25   our allegations exactly are.  As an initial matter, I would

1  say that Mr. Silva and I agreed at the inclusion of

2  Miss Fallon's deposition testimony that we would invoke the

3  rule, Rule 615, as it applies to this deposition.  Apparently

4  Mr. Silva and I had a misunderstanding about what invoking the

5  rule or what the parameters of invoking the rule were because,

6  frankly, Mr. Stinson shouldn't even know what he knows about

7  the deposition as it exists.  I would encourage the Court to

8  review the deposition in camera as I think that it's very

9  telling about what actually happened here.

10         So let's talk about relevance, Your Honor.

11  Miss Fallon is a resident of the state of Indiana.  She has no

12  connection whatsoever to Cody, Wyoming.  She has never met

13  Dr. Biles.  She doesn't know anything about Dr. Biles.

14  According to Mr. Stinson's brief, Miss Fallon -- or, I'm

15  sorry, Dr. Schneider is a competing physician with Dr. Biles.

16  What this flyer did to Dr. Biles was assassinate his

17  character.  It is untrue, the statements that were made about

18  him, patently untrue.  Everybody from the Wyoming state Board

19  of Medicine to the sheriff has determined that it is untrue.

20  And Miss Fallon has taken responsibility for the creation of

21  the flyer.  We would put forth, Your Honor, that we believe

22  that Miss Fallon has done this at the direction of

23  Dr. Schneider, that she has taken full sole responsibility to

24  prohibit us from going into these matters.

25         Miss Fallon has e-mailed extensively with

11-CV-00294-J                  Motion                01/04/2012    10

1   Dr. Schneider.  Therefore, we have asked for her e-mails.

2   Miss Fallon and Dr. Schneider have used multiple e-mail

3   accounts to e-mail.  Therefore, we have asked for all e-mail

4   accounts.

5        Dr. Schneider has phoned Miss Fallon repeatedly, and

6   I would paraphrase this by saying that perhaps after this

7   flyer came out or in the time period when this flyer came out

8   it increased at least, at least tenfold the amount of

9   communications they had.  So we, therefore, have asked for the

10  phone records.

11       There was testimony, Your Honor, that Miss Fallon and

12  Dr. Schneider were in extensive communication on the exact day

13  preceding the deposition.  Your Honor, when you review the

14  file, you'll see that Magistrate Skavdahl had a hearing

15  because Miss Fallon was attempting to get out of her

16  deposition based on medical needs.  Dr. Schneider was actually

17  discussing, as a neurosurgeon, her gynecological problems with

18  her the day before this deposition, and we believe there's

19  evidence to suggest that he was even instructing her to go to

20  the hospital so as to avoid the deposition.  There's numerous

21  phones that these calls have been made on, so we narrowly

22  tailored our request to those phone calls.

23       And, finally, although Mr. Stinson represents that

24  the Schneiders knew nothing of what was going on with this

25  flyer, in October or early November of 2010, immediately prior

Julie H. Thomas, RMR, CRR                        (307)778-0078

11-CV-00294-J                    Motion              01/04/2012    11

1    to the flyer being disseminated to almost 14,200 residents of

2    the Big Horn Basin, that Mrs. Schneider sent $5,000 to

3    Miss Fallon.  There's testimony that Miss Fallon -- I'm sorry,

4    that Dr. Schneider was actually in communication with the

5    printer who printed the flyer.

6          So to actually suggest, Your Honor, that no one knew

7    anything that was going on is an interesting interpretation of

8    the facts.

9          Your Honor, I will share a few things with you from

10   the deposition with your permission.

11         THE COURT:  Let me ask, before you do that, is there

12   some way that I gain access to that deposition?

13         MR. FLECK:  Your Honor, we can send it to you.

14         THE COURT:  Probably not a bad idea, and I can look

15   at it in camera as well, but go ahead.

16         MR. FLECK:  In the deposition, Your Honor,

17   Miss Fallon said that when this happened she began destroying

18   evidence, that she destroyed three key pieces of evidence, and

19   she admits under oath that these are the three most important

20   pieces of evidence in the entire case.  Number one is the

21   e-mails.  Number two, it is the list of individuals that was

22   supplied to her by Dr. John Schneider so that she could

23   perform this defamatory act upon Dr. Biles.  And then,

24   finally, the third thing that she destroyed was the actual

25   flyer.

1          Now, Your Honor, it's a little bit confusing here,

2   but in October, immediately after Dr. Biles was pulled over

3   for a DUI, I'm sorry, immediately after he was pulled over for

4   a DUI, six flyers showed up in West Park Hospital that

5   contained information about his arrest.  I would suggest to

6   the Court that that flyer is substantially similar in many

7   respects to the flyer that Ms. Fallon, quote/unquote, and I'm

8   putting huge air quotes around here, claims to have created.

9   Miss Fallon has testified under oath that she did not have any

10  knowledge of another flyer that existed in October in the ER

11  or in the OR, rather, of West Park Hospital.  Therefore, we

12  would suggest to the Court that somebody somewhere had to have

13  provided that flyer to Miss Fallon.

14         This is a clear indication in every way possible,

15  someone who had no connection whatsoever with Wyoming, who

16  picks Dr. Biles' name out of a hat, does this to him, has

17  numerous, numerous connections with the Schneider family, who

18  Mr. Stinson claims is a competing physician who gave money,

19  who gave the mailing list, and who also provided much

20  additional information, Your Honor, that I'd rather not

21  discuss right now because we have a nonparty on the phone,

22  those are all reasons that this is highly, highly relevant

23  information.  It's not only highly, highly relevant

24  information, Your Honor, but it is so vitally important

25  because of the past testimony about the destruction of

1    evidence.  The idea that we could be protected, that there

2    would be no spoliation, that cow is gone already.  That cow is

3    out of the barn.  There has been evidence that's been

4    spoliated.

5            Now, Your Honor, I want to talk to you about

6    something else, and everybody here on the phone knows what I'm

7    going to talk about, and that is that the FBI and the U.S.

8    Attorney's Office is currently examining documents that were

9    found in West Park Hospital that seem to indicate that

10   somebody in Cody, Wyoming, was trying to monkey with the

11   testimony that went on in that deposition.  Also, there is

12   testimony, and it's in front of the U.S. Attorney and the FBI

13   right now, that somebody actually wrote, somebody not

14   Mr. Silva, actually wrote Miss Fallon's interrogatory answers

15   for her.  And these were all found in the laundry at the West

16   Park Hospital.  Those documents then went to the Park County

17   attorney, Bryan Skoric, and he sent those on to Mr. Silva and

18   I and immediately sent them on to the U.S. Attorney and the

19   FBI.

20           Now, I don't know what those documents mean because I

21   haven't seen the jump drives that they were found on, I

22   haven't had them forensically examined, I don't really know

23   what the metadata shows, but it's awfully, awfully fishy that

24   they happened.

25           And the reason I bring this up to you, Your Honor, is

1   twofold.   Number one is because I'm an officer of the Court,

2   Your Honor, and as an officer of the Court I believe that

3   somebody has attempted to suborn perjury in this case.   I

4   think that it's very, very serious.   I don't want to interfere

5   with the criminal process in any way, shape, or form, but

6   something fishy happened up there with those documents.

7          Number two, the reason I bring this up is because if

8   we're sitting here talking about gathering evidence, as we are

9   not only entitled to but by Judge Skavdahl's order we're

10  required to determine who these additional conspirators were

11  and report back to him by the end of the month, we need this

12  information, and we need people to keep their hands off this

13  information and not try to manipulate it, not try to destroy

14  it.

15         This is very, very serious what happened here.   It's

16  very, very serious not only because a good man was defamed for

17  no real reason other than spite, but it's also -- now it's

18  become important for the process, Your Honor.   The process is

19  being subverted here, and I don't have any idea who's doing

20  it, but I know somebody's doing it.   Evidence is being

21  destroyed.   Evidence is being manipulated.   I believe in my

22  heart that the evidence will show that testimony has been

23  manipulated.

24         And so Mr. Stinson, in his report from Mr. Silva

25  about a sequestered deposition, Mr. Stinson is correct that if

1   you read the cold page she says I did it, there's no doubt, I

2   did it, I took all responsibility, I didn't have any

3   coconspirators, nobody knew anything else about this.  That's

4   what the testimony will read.  If you look at the video, I

5   think it gets pretty shaky about what it actually means.  And

6   that's why, I guess, the jury gets to determine the

7   credibility of witnesses because that's profoundly uncredible

8   testimony, profoundly.  Somebody has monkeyed with this

9   process, Your Honor, and this evidence is needed, it's

10  relevant.

11          Now, let's talk about the other.  You know, there's

12  four reasons you can deny a subpoena.  You can say that it

13  didn't allow much time, that it was out of the range, that it

14  somehow involves privileged material, or that it's too

15  burdensome.  Well, we'll take care of that last prong

16  completely.  We'll pay for anything that it costs to be able

17  to preserve that evidence.  And we will share anything that we

18  have, anything that we find, with Mr. Silva and eventually

19  with Dr. Schneider as well once it's evaluated.  So there is

20  no burden whatsoever.

21          The process demands, justice demands, Your Honor,

22  that this evidence be gathered in this, that whatever has gone

23  on in this stinky mess is determined and found out and

24  exposed.  And that's my argument, Your Honor.  If you have any

25  questions, I'd be glad to answer them.

1        THE COURT:  All right.  You've dealt with relevance,

2   your need for the documents, the spoliation issue, and the

3   burden imposed.  What about the two years, I guess the breadth

4   of the document request?

5        MR. FLECK:  Well, Your Honor, here's the reason for

6   that.  The timing of this is there's been testimony that the

7   frequency of communications, we suspect, Your Honor, because

8   of the nature, but the tone of the communications, the tenor

9   of the communications, the substance of the communications,

10  but then also this idea that they've had a relationship

11  together for a very long time, that they claim to have a

12  financial relationship together for a very long time, but then

13  all of a sudden just about the time that this dirty deed is

14  done on Mr. -- on Dr. Biles, just about that time they start

15  exchanging funds.  And it's a serious amount of money.  This

16  isn't, you know, this isn't a penny-a-flyer kind of deal.

17  This is over $5,000 to a woman who says that she's living

18  paycheck to paycheck.  She says this money was given to her by

19  the Schneiders for their goddaughter, whose name is Sarah

20  Fallon or Sarah Shaurette.  It's interesting.  I believe that

21  she said her name was Shaurette, which is Miss Fallon's maiden

22  name.

23        So do I really want all of these documents?  No.  I

24  would love this, Your Honor, to be tailored, and I'd love it

25  to be the kind of case where I could just simply pick up the

11-CV-00294-J                Motion              01/04/2012    17

1   phone and say, like we used to a lot under the old

2   self-executing discovery rules, here's what I'd like to have,

3   could you please send it to me.  But, Your Honor, because they

4   have, have I believe tried to manipulate this process to such

5   a degree, I don't trust them to give us what we're asking for.

6   And this is in no means, no way a reflection on Mr. Stinson,

7   but I don't believe that Mr. Stinson understands the gravity

8   of what has gone on in this case.  I don't think he

9   understands.

10          And so I would want these to be narrowly tailored,

11   but the problem is I need to show a pattern.  I need to show a

12   pattern of behavior that these people engaged in, and then I

13   need to show if that pattern changed.  And that would be very,

14   very relevant to what I believe is the extraordinary

15   conspiratorial misconduct that went on in this case.

16          And so I'm sure that I wouldn't like somebody going

17   through my dirty laundry and trying to come up with some sort

18   of case against me, but, Your Honor, if it doesn't show

19   anything, then it doesn't show anything, but at this point

20   it's just -- it couldn't be more relevant, it couldn't be more

21   critical.  And that two years I think is a very, very narrow

22   kind of focus.  Here we sit, it's January 2012.  If we ask to

23   go back to January of 2010, we would have 10 months of showing

24   whatever kind of pattern of communication these people had

25   with one another, and then I can almost guarantee you that

11-CV-00294-J                    Motion                01/04/2012    18

 1  it's going to show you that after Dr. Biles made a human

 2  mistake that lots and lots of folks make, after that moment in

 3  time you're gonna see a very, very different level of

 4  communication.  And Your Honor is going to see as well, upon

 5  reading the deposition, that they did some other interesting

 6  things, too.  They were using multiple e-mail addresses and

 7  using code to tell each other which e-mail address was going

 8  back and forth and which one to open, which one not to open.

 9          Your Honor, I might as well take just one other

10  second to educate the Court about this because you will have a

11  subpoena coming your way very shortly, and I'm certain that it

12  will be on your desk, but they used -- she was an ICU nurse

13  out in Indiana, and they used the hospital's phone system and

14  the hospital's e-mail system to transmit all of this stuff.

15  And we believe that eventually we're going to find that there

16  was a transmission of the very documents that were found in

17  the hospital OR laundry which attempted to suborn perjury in

18  this case.

19          So, Your Honor, I mean, I think that it's, that it's

20  very, very obvious the gravity of this situation, and we'd ask

21  you to deny the motion to quash and to ask that these

22  documents be produced forthwith.

23          THE COURT:  Thank you.

24          Mr. Stinson, anything further you wish to say?

25          MR. STINSON:  Your Honor, just briefly, I obviously

Julie H. Thomas, RMR, CRR                              (307)778-0078

1   don't have the advantage of having seen the deposition

2   transcript, but I, I'm thinking the Court wants to read that,

3   and certainly the Schneiders would feel most comfortable with

4   the Court reading the transcript and reaching its own

5   conclusion as to whether there's been some relevant link

6   established between her testimony and the items sought.  You

7   know, I felt like sort of a -- certainly, as Mr. Fleck

8   described it, it seemed incredibly dramatic, and it seemed as

9   if there, there was this conspiracy for that to happen, but

10  obviously that's the plaintiff's job to make those allegations

11  and to paint with a broad brush and to create that drama.  And

12  for this moment in time I am asking that the Court be much

13  more interested in what is the actual testimony given by

14  Miss Fallon and what are the factual underpinnings of the

15  claim and do those create that relevant link to obtain this

16  sort of a broad brush of information from the Schneiders.

17          If the Court finds that is so, that there exists

18  grounds for some or all of that to be sought, I would simply

19  ask that the scope be limited so that not all e-mails are

20  disclosed, not all phone calls are disclosed, but rather phone

21  calls and e-mails between the Schneiders and Miss Fallon, that

22  not 15 years of financial history be disclosed.  In fact, I'd

23  ask that no financial history be disclosed unless there is a

24  denial on the part of the Schneiders that over the years they

25  have provided money to Miss Fallon.  I am told she testified

11-CV-00294-J                Motion                01/04/2012    20

1    that they have.  So I would ask that the Court, if it finds

2    that link, if it finds there's relevance, to limit the scope

3    to the relevance and not simply to the very broad request.

4         Lastly, I just want to make sure that if there is a

5    cost for production, whatever that cost might be, it be borne

6    by the plaintiff.  Plaintiff said it will pay for anything it

7    costs to preserve the evidence, but I want to make sure that

8    statement or the Court's order would include produce the

9    evidence.  I would ask that information not be -- phones and

10   computers not be handed over but rather third parties in the

11   form of forensic technologists would obtain that information.

12        So that's my request in toto, Your Honor.  I thank

13   you.

14        THE COURT:  Thank you.

15        MR. FLECK:  Your Honor, this is Dan.  We would agree

16   to have third parties and would insist that third parties be

17   the persons to forensically take over that information.

18        As far as the deposition is concerned, Your Honor, it

19   is as has been represented to you, that she is going to admit

20   that she -- she is going to admit that she was the sole author

21   of this document, and I just think that it's incredible to say

22   that, well, you should listen to what the deposition testimony

23   is because the deposition testimony is a very small part of

24   the story.  But I think that the Court will be fascinated by

25   the deposition testimony itself.

Julie H. Thomas, RMR, CRR                          (307)778-0078

1          THE COURT:  Well, I'm not sure based upon your

2    representation, and I'm not hearing any objection to that from

3    Mr. Silva at this point that his client --

4          MR. SILVA:  Your Honor, you mean in -- this is Craig

5    Silva on behalf of Miss Fallon.  You mean in regard to

6    production of that to the Court?

7          THE COURT:  No, in regard to the deposition.

8          MR. SILVA:  Yeah, I think the deposition speaks for

9    itself, but I don't necessarily disagree with the

10   representations made by Mr. Fleck in regard to what the

11   deposition testimony was.

12         THE COURT:  Very well.  And as I understand your

13   position, you may oppose the production in this matter;

14   however, you don't consider yourself to have significant

15   standing in the Schneiders' position in it.

16         MR. SILVA:  That's correct, Your Honor.  Craig Silva

17   on behalf of Miss Fallon.  I don't know that we necessarily

18   have a dog particularly in this fight, although I think these

19   same issues may raise themselves at a later date in requests

20   that have been made upon us by Mr. Fleck, although we're

21   trying to work those things out.

22         THE COURT:  Very well.

23         Mr. Stinson made reference to statements made by the

24   plaintiff on pages 8 and 9 of their response that they -- that

25   he does not see any support for those, and I assume you

1  wouldn't -- I wouldn't look for that kind of support in the

2  deposition of Miss Fallon.

3          MR. FLECK:  And, Your Honor, this is Dan Fleck.  I

4  just -- I'm on page 8 and 9 of the dep -- or of our response,

5  but you cut out on the rest of it.  I apologize.

6          THE COURT:  What I'm assuming is that your support

7  for each of those allegations and your denials is evidence

8  outside of the deposition that you have accumulated.

9          MR. FLECK:  Your Honor, I believe that most of that

10  information is contained within the interrogatory answers that

11  we believe were created by a third party and that were

12  propounded as her own by Miss Fallon.  So I don't know whether

13  those things are true or not, but if you go to the last

14  sentence of the first full paragraph on page 9, it says that

15  the interrogatory answers provide the following facts.

16          Now, what Mr. Stinson is claiming -- Miss Fallon

17  claims that basically Jimmy Biles is a vile human being who

18  has committed many, many, many wrongs in his life, and one of

19  the wrongs that she claims he committed was getting into some

20  sort of motor vehicle accident while he was drunk.  We are

21  making a statement in the record that she has stated that in

22  her interrogatory answers and it's just simply not true.

23  There's no record of it anywhere.  She made it up or, Your

24  Honor, with all due respect to Mr. Stinson, that information

25  was supplied to her by the one and only person who could have

1    supplied it, which is either John Schneider or Michelle

2    Schneider.

3           Now, there are many examples I believe in the

4    interrogatories of her attempting to use the interrogatories

5    or her author attempting to use the interrogatories to further

6    malign and defame Dr. Biles.  And those matters are not true,

7    but for the purposes of our discussion here the fact is that

8    she would have absolutely no way in the entire world to know

9    any of this stuff unless it was told to her by the only person

10   she really knows in Park County, only people she knows in Park

11   County, which is Michelle Schneider or which is John

12   Schneider.  She lists a whole, whole lot of other people that

13   could have supplied her that information, but I believe when

14   Your Honor reviews the deposition he is going to understand

15   where that information must have come from.

16          So I -- that's giving you a lot more information than

17   you asked for, Your Honor, but those -- the information that

18   we're supplying on page 8 and 9 we believe is from her

19   deposition -- or, I'm sorry, from her interrogatory answers.

20   And if we say it's not true, well, then maybe that doesn't

21   have a cite to it because she's been the only witness who's

22   been deposed.  Maybe that's us telling you that based on our

23   investigation it's not true.  It isn't in the defamatory

24   flyer.  What it is is an attempt to use this process, the

25   court process, the interrogatory process, to further insult

1   and defame Dr. Biles.

2          MR. STINSON:  Your Honor, this is Laurence Stinson.

3   The point I was making was the one just made by Mr. Fleck,

4   which is whether that information is true or not true, it did

5   not find its way into the defamatory flyer, the alleged

6   defamatory flyer, which is sort of the heart of the action of

7   Biles v Fallon.  So my point was the information, whether true

8   or not true, is not relevant to the link between the subpoena

9   and the need for information.  That was the point I was trying

10  to make.

11         THE COURT:  I understand.

12         MR. FLECK:  And, Your Honor, if you -- this is Dan

13  talking.  If the Court examines the three documents that were

14  found up there in the laundry in Cody, what the author of

15  those documents says, purportedly to Miss Fallon, is, is that

16  it doesn't matter if any of this stuff is true or false, the

17  only thing we want people to do is we want people to look at

18  his mugshot, we want people to go to the website and look at

19  the mugshot.

20         So the conspiracy here is pretty broad, and it's much

21  bigger than the defamatory flyer, because what's attempting to

22  be done here is they are attempting to use this process itself

23  to actually make things worse for Dr. Biles.  And we believe

24  that those documents that were found in the West Park Hospital

25  will ferret that out.  And I think really, Your Honor,

1   that -- well, I don't know.  I should ask you.  Do you want

2   those documents when the U.S. Attorney and the FBI is looking

3   at them?  I can see that you wouldn't, but on the other hand,

4   you know, this happened in your court, and somebody somewhere

5   did something that I've never seen.  And I've only been a

6   lawyer for 16 or 17 years, but you can ask Mr. Silva if he's

7   ever seen anything like that.  You can ask Bryan Skoric if

8   he's ever seen anything like it.  Anybody who's ever looked at

9   that has never seen anything like it.  So I don't know what to

10  do about that either.  I've been told by a wise old man that I

11  should just put it in your court and let you make that

12  decision about what to do with it because I don't know what to

13  do with it.

14          THE COURT:  Well, I assume that there will come a

15  time when we'll have to decide and determine what to do about

16  it.

17          I'm trying to think through the issue at this point

18  as to what benefit delaying ruling while I look at the

19  deposition will accomplish, and, frankly, I can't see any.  We

20  know at this point that, as Mr. Stinson has said, Miss Fallon

21  did not seek a preapproval from the Schneiders, that she was

22  the architect, whatever that means, of the document, that is,

23  I am assuming, that she wrote the words, and that she has

24  stated in her deposition, as Mr. Fleck has affirmed, acted

25  alone in this matter.  So reading the deposition probably is

 1   not going to be of material assistance in terms of resolving

 2   this dispute.

 3            Conspiracy is a circumstantial, oftentimes a

 4   circumstantial matter in that those who are involved in a

 5   conspiracy are usually less than transparent in their conduct,

 6   and the parties have to follow the crumbs wherever they may

 7   lead.  Certainly the -- I'm satisfied at this point that the

 8   evidence that is being sought in this matter would be relevant

 9   and that should the evidence disclose participation by the

10   Schneiders would be of relevance and significance in this

11   matter since Miss Fallon does not have a close connection with

12   events occurring in Park County, Wyoming, nor with the

13   plaintiff in this matter, Dr. Biles.

14            There appears to be a need to understand the

15   conspiracy in this case for several reasons.  First of all, to

16   seek the truth of what is involved in this matter.  Secondly,

17   it sounds to me like as if Miss Fallon is a person who the

18   plaintiffs, in their conspiracy theory, believe was used as a

19   conduit for information and is not a source of the defamation

20   which the plaintiffs wish to attack.  Third, the time period,

21   I notice that many of the events in this matter occurred

22   during a time of -- within the last two years, and for the

23   most part I don't see the breadth of the time period to be of

24   particular concern.  And the list of financial information is,

25   asking for accounts and account numbers since 1996, doesn't

1    appear to be an undue burden either in terms of the breadth

2    that is being sought.

3          The particularity that has been described in this

4    matter by the plaintiffs seems to be reasonable especially in

5    view of the fact that the plaintiff has agreed to accept the

6    costs of production of these documents and has agreed further

7    that any examination of electronic devices or media will be

8    conducted by independent third party, independent in that it

9    would be a third party expert of some kind probably who would

10   be paid by the plaintiff, which works against independence,

11   but it seems to me the parties could work that out.

12         And so I would, I would order in this matter that the

13   motion to quash should be and the same is to be denied.  The

14   third parties are ordered to produce the documents.  The

15   plaintiff will pay the costs of production as a condition of

16   the production and will, in terms of any electronic analysis

17   or invasion of computers, will utilize the services of an

18   independent third party.

19         Now, I've also heard in the arguments in this matter

20   that among the computers and telephones and items that have

21   been used in this matter are items that are not in the custody

22   of either Miss Fallon or Miss Schneider and that the plaintiff

23   in their investigation in this matter are concerned about

24   computers and telephones located in hospitals in other

25   locations.  What's going to happen there?

1          MR. FLECK:  Your Honor, I don't know.  I'm very, very

2    concerned, and I've expressed these concerns to Mr. Silva,

3    that the minute that subpoena goes out that Miss Fallon is

4    going to be fired.  I do not want that to happen.  I think

5    that she is a pawn in this matter, and I do not want her to

6    suffer some kind of right/wrong detrimental injury because of

7    this matter.  But the fact of the matter is she works at a

8    place called Community Hospital out in Indiana.  She is an ICU

9    nurse out there.  They each have an individual employee

10   e-mail, and that e-mail we believe has been used extensively

11   in communicating with Dr. Schneider.  Also, we believe that

12   there is a phone system.  Now, what Miss Fallon testified to

13   in her deposition is that she might have used up to 20

14   different computers at Community Hospital to communicate, that

15   she might have used 20 different phone systems.  We have

16   subpoenas for West Park Hospital, and those subpoenas, and we

17   haven't been able to trace all those numbers yet, but those

18   subpoenas show many, many, many calls from West Park Hospital

19   to Indiana, but more significantly to this little town that

20   nobody's ever heard of, Fishers, Indiana.

21          So I don't know, and I've asked Mr. Silva, sort of

22   repeatedly expressed this concern I have about what the effect

23   of the subpoena is going to be on Miss Fallon, and we haven't

24   been able to come up with any answers.  I think he believes

25   that my concerns are true and sincere and that he holds those

11-CV-00294-J                Motion              01/04/2012    29

1   same concerns as well, but, you know, it is what it is.  And I

2   think that, I think that we're probably going to need to have

3   a deposition of the CEO out there from this hospital and find

4   out what information there is.  I mean, I think that to a

5   degree, Your Honor, going back to the Schneider ruling, I

6   think we're going to need to have some sort of records

7   deposition there, too, to find out what this information is.

8   And I think that the Court and the parties could shortcut

9   matters significantly, particularly as it applies to

10  nonelectronic information, that we be provided -- we provide

11  them with releases just like we would in a medical malpractice

12  case and that we are allowed to procure those records directly

13  from the providers.

14        I would hope, now going back, switching back to the

15  Indiana matter and Indiana hospital, I would hope that, you

16  know, in light of the Court's involvement in this matter and

17  your concern about that issue as well, that Mr. Silva and I

18  could get on the phone and that he could talk to Miss Fallon

19  about some other possible ways of providing us that

20  information.  But it's a huge concern of mine, I don't know

21  what to do about it, and so, you know, that's where we are.

22        And Christine put a note in front of me, too, that I

23  need to probably mention that those West Park Hospital

24  computers, we also believe that there are computers at West

25  Park that were used to e-mail things.

1            THE COURT:  Well, you have --

2            MR. SILVA:  Your Honor, this is -- I'm sorry, Your

3    Honor.

4            THE COURT:  I would be concerned -- you know, these

5    are concerns that are probably premature at this point in

6    terms of patient safety and patient confidentiality,

7    et cetera, but it seems to me there may be some need for

8    filtering.

9            MR. FLECK:  100 percent, Your Honor.  This is Dan.

10   We would protect anything of that nature.  I have already told

11   Mr. Silva, because we're going to need to get -- one of the

12   requests that I have, and he sort of alluded to it in his

13   argument, we want her computers as well, Lisa Fallon's

14   computer.  Now, predictably, and I don't want to come off as

15   too much of a jerk here, but the main computer that was used

16   by Miss Fallon claims to have had orange juice spilled all

17   over it, close quote.  If it was any other case, I might just

18   say, oh, well, that's the luck of it, you know, but in this

19   case I've got to raise my eyebrow and say I wonder how that

20   happened.

21           But the deal that I've proposed to Mr. Silva and I

22   believe that he has agreed to is any attorney-client matters

23   that we see in there we would fully 100 percent agree to

24   protect and would not inquire.  We would ask our expert to

25   peruse those things or, as you said, Your Honor, filter them

1   and to come up with something so that we don't see those.  And

2   as far as any HIPAA information, as far as any patient

3   information, you know, I have a suspicion that we're going to

4   get a little bit of a dump truck here anyway as far as a load

5   of information, and we don't want any of that stuff, Your

6   Honor.  And ordinarily I would just say, as I said earlier,

7   let's have counsel tailor that, but in this case I just

8   don't -- I just don't necessarily trust the product that I'm

9   getting from the person that's the subject of a subpoena, not

10  any reflection on counsel.

11          So it's a roundabout and meandering way of saying,

12  Your Honor, we'll do anything that we need to to protect

13  confidential attorney relations, confidential attorney

14  communications or any sort of HIPAA medical records, private

15  information.  We just don't want it, but beyond that we would

16  obviously protect it in any way we had to.

17          THE COURT:  Do counsel feel they will be able to work

18  out the mechanics of doing that?

19          MR. SILVA:  Your Honor, this is Craig Silva on behalf

20  of Miss Fallon.  In regard to her computers and her phone, we

21  are working with Mr. Fleck's office in regard to getting those

22  things taken care of.  So I think, yes, counsel can work

23  through that.

24          In regard to the computers and the phone systems at

25  the hospital, I don't have a solution to that issue.  I have

1   the same concerns that Mr. Fleck had that Miss Fallon will

2   probably lose her job.  Once that subpoena gets served, I'm

3   sure they'll do some sort of investigation, and I can only

4   imagine that it wouldn't be -- wouldn't bode well for her.

5   But I don't have any good ideas about how to resolve that,

6   that Gordian knot.

7           MR. STINSON:  Your Honor, this is Laurence Stinson.

8   As we were talking I realized I hadn't given consideration

9   fully to the idea that the Court would order the computers be

10  physically produced.  Now I have some concern.  I have never

11  asked Dr. Schneider whether there is patient information or

12  other confidential information on that, on those hard drives

13  or the telephones.  Unless the Court has a creative idea, my

14  suggestion would simply be that Mr. Fleck and I instruct the

15  third party to do the filtering, just as he said, and that the

16  attorneys aren't privy to that in some way, but I do have

17  those concerns.

18          THE COURT:  That appears to me to be a practical

19  solution -- this is Judge Johnson again -- to a problem that

20  really has not totally developed at this point but counsel are

21  correctly anticipating, that those matters could be filtered,

22  treated almost like a criminal case where there's a wiretap

23  situation and those matters which are not related directly to

24  this matter should be filtered out.

25          MR. FLECK:  We agree with Your Honor.  This is Dan.

11-CV-00294-J                    Motion                01/04/2012    33

1   And we'd certainly abide by that ruling.

2           THE COURT:  Very well.  Any questions?

3           MR. FLECK:  Your Honor, my only -- this is Dan again.

4   My only question would be as to the releases.  I think that it

5   would be highly appropriate in this case, and maybe it isn't

6   even within the Court's power to command a release, but I

7   believe on the noncomputer information that that would

8   simplify things tremendously.

9           THE COURT:  I'm not sure it's within my power to tell

10  people to issue a release in that we are using the power of

11  the Court to compel production at this point but attempting to

12  put into place something that will protect information that is

13  not relevant or helpful to the disposition of this case.  And

14  understanding --

15          MR. FLECK:  Again, on the issue of cost and the level

16  of burdensomeness that this could create on the parties and

17  the level of future involvement of the Court in the matter of

18  whether we did get everything produced, it would certainly

19  simplify things, but I think I understand the Court's

20  position.

21          THE COURT:  All right.  Very well.  Thank you.

22          MR. FLECK:  Thank you, Your Honor.

23          MR. STINSON:  Thank you, Judge.

24          MR. SILVA:  Thank you, Your Honor.

25          THE COURT:  Thank you.

1   (Proceedings concluded 9:31 a.m.,

2   January 4, 2012.)

3

4       *  *  *  *  *

5

6       C E R T I F I C A T E

7

8

9    I, JULIE H. THOMAS, Official Court Reporter for the

10 United States District Court for the District of Wyoming, a

11 Registered Merit Reporter and Certified Realtime Reporter, do

12 hereby certify that I reported by machine shorthand the

13 proceedings contained herein on the aforementioned subject on

14 the date herein set forth, and that the foregoing pages

15 constitute a full, true and correct transcript.

16    Dated this 16th day of January, 2012.

17

18

19

20      ___/s/ Julie H. Thomas___

21       JULIE H. THOMAS
       Official Court Reporter
22      Registered Merit Reporter
      Certified Realtime Reporter
23       CA CSR No. 9162

24

25